**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | | |
|---|---|---|
| In re: | ) | BAP No.   EC-11-1320-MkPaD |
| | ) | |
| MICHAEL SHANE HANSEN and AMY HANSEN, | ) ) | Bk. No.   10-20248-C-7 |
| | ) | Adv. No.  10-02180-C |
| Debtors. | ) | |
| _____ | ) ) | |
| STATE OF CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, | ) ) ) ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| MICHAEL SHANE HANSEN and AMY HANSEN, | ) ) | |
| | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

Argued and Submitted on
March 22, 2012 at Sacramento, California

Filed - April 18, 2012

Appeal from the United States Bankruptcy Court
for the Eastern District of California

The Honorable David E. Russell, Bankruptcy Judge, Presiding

Appearances:     Amy Julia Winn for the Appellant.
                 Julia Patricia Gibbs for the Appellees.

Before:  MARKELL, PAPPAS, and DUNN, Bankruptcy Judges.

MARKELL, Bankruptcy Judge.:

**INTRODUCTION**

The California Employment Development Department (the "EDD") appeals the bankruptcy court's judgment that certain unpaid unemployment insurance taxes were not the kind of taxes specified in § 507(a)(8)(C).[1] As a consequence, the bankruptcy court held that the unpaid unemployment insurance taxes in this case did not give rise to a nondischargeable debt within the meaning of § 523(a)(1)(A). We AFFIRM.

**FACTS**

One of the debtors in this case, Michael Shane Hansen ("Hansen"), was president of Onvoi Business Solutions, Inc. Onvoi Business Solutions, Inc., in turn, was part of a group of related companies which included OBS Personnel, Inc., Onvoi Holdings, Inc., and Birdcage Travel, Inc. (collectively, the "Onvoi Entities" or "Onvoi"). The Onvoi Entities provided human resources and staffing solutions to private clients.

In December 2002, Onvoi purchased Birdcage Travel, a company which held an unemployment insurance tax rate of 0.9%. That rate, established by the EDD, was considerably lower than the 4.7% rate at which the EDD had assessed Onvoi's unemployment insurance tax liability.[2] Once the sale closed, Onvoi

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] As stated in a treatise summarizing California law on this point, employers are assessed a contribution rate for unemployment insurance tax as follows:

(continued...)

2

transferred its employees from its existing EDD employer account – with the 4.7% rate – to the EDD employer account formerly maintained by Birdcage Travel – which had the 0.9% rate. Based on the EDD's calculation, this saved Onvoi approximately $2.8 million in unemployment insurance taxes.

On March 29, 2004, the EDD issued a notice of assessment, pursuant to California Unemployment Insurance Code § 1735,[3] to

---

[2](...continued)

   Although all employer contributions are pooled and available for unemployment benefits regardless of source, a merit rating system is established with respect to contribution rates by which the rate for each employer is graduated according to the balance of contributions paid by and benefits charged to that employer. . . .
   The contribution rate for an employer is established for each calendar year on the basis of the relation, on the computation date, of the employer's "net balance of reserve," that is, the excess, if any, of contribution credits over benefit charges in the employer's account as of that date, and the employer's "average base payroll," that is, the yearly average of taxable wages paid during a specified number of calendar years preceding that date.

60 CAL. JUR. 3D, Unemployment Compensation § 20 (2012); see also Cal. Unemp. Ins. Code § 977 (2012).

[3] California Unemployment Insurance Code § 1735 provides:

Any officer, major stockholder, or other person, having charge of the affairs of a corporate, association, registered limited liability partnership or foreign limited liability partnership, or limited liability company employing unit, who willfully fails to pay contributions required by this division or withholdings required by Division 6 (commencing with Section 13000) on the date on which they become delinquent, shall be personally liable for the amount of the contributions, withholdings, penalties, and interest due and unpaid by such employing unit. The director may assess such officer, stockholder,
                                                    (continued...)

3

Hansen, individually, and/or as a responsible person of the Onvoi Entities. The total amount assessed was $4,820,523.86. This amount included $2,872,050.34 in unpaid unemployment insurance taxes from January 1, 2003 through September 30, 2003; $1,753,521.28 in penalties;[4] and $194,952.24 in unpaid interest. According to the EDD, the assessment represented the difference between the amount of unemployment insurances taxes Onvoi paid based on Birdcage Travel's 0.9% unemployment insurance tax rate and the amount Onvoi should have paid had it applied the correct 4.7% rate.

### The Settlement Agreement

Hansen, Michael Alexander Dimanno, Steven Dennis Whitney, and Steven Bradley Serafin (collectively, the "Onvoi Principals") signed a settlement agreement (the "Settlement Agreement") with the EDD. The Settlement Agreement resolved not only the notice of assessment the EDD had issued to Hansen; it also resolved the notices of assessment the EDD had issued to each of the remaining Onvoi Principals.

The Settlement Agreement provided as follows:

---

[3](...continued)
or other person for the amount of such contributions, withholdings, penalties, and interest. The provisions of Article 8 (commencing with Section 1126) and Article 9 (commencing with Section 1176) of Chapter 4 of Part 1 apply to assessments made pursuant to this section. Sections 1221, 1222, 1223, and 1224 shall apply to assessments made pursuant to this section. With respect to such officer, stockholder, or other person, the director shall have all the collection remedies set forth in this chapter.

[4] The copy of the notice of assessment included in the excerpts of record does not specify the statutory bases for the penalties imposed.

4

A. The [Onvoi Principals] shall pay the sum of $1,600,000 in eleven monthly payments within 12 months after an Administrative Law Judge (ALJ) of the CUIAB approves this Settlement Agreement ("Approval Date"). The [Onvoi Principals] shall also pay all accrued interest and additional penalties and interest thereon, which shall accrue during the eleven months following the due date for the first payment shall accrue pursuant to the Unemployment Insurance Code section 1135. The total sum of the payments due during the eleven months following the Approval Date shall be principal in the amount $1,600,000, penalty in the amount of $133,333.33, plus interest in the amount of $1,027.04, for a total sum of $1,734,360.38. ("Total Amount Owed"). If the [Onvoi Principals] pay the principal sum of $1,600,000 plus accrued interest and penalty prior to 12 months after the Approval Date, then the mandatory penalty shall cease to accrue.

. . .

C. If the [Onvoi Principals] fail to make any of said eleven payments on a timely basis, then the EDD will deem such failure to constitute a default in the payment schedule and a material breach of the Settlement Agreement. Hansen will then have thirty additional days to make said defaulted payment and the balance owed for the Total Amount Owed under the Settlement Agreement, with credit given for all previously made payments ("Balance Due").

D. If Hansen fails to pay the Balance Due within the 30 days following default as set forth in the Paragraph 8(c) above, then the EDD shall deem Hansen to have defaulted and to be in material breach of the Settlement Agreement. The EDD shall then have the right to collect the Balance Due from Hansen using all means allowed by law.

E. If Hansen does not pay the Balance Due and the EDD is unable to collect the balance within 60 days following the default, then the EDD shall deem Hansen to have made a second default ("Second Default"). Hansen shall then owe to the EDD the original amount of the Challenged Assessment issued against Hansen in the amount of $4,820,523.86, with EDD giving credit for all payments made by the [Onvoi Principals] ("Challenged Assessment Balance["]). Interest and penalties shall accrue on the amount [of the] Challenged Assessment Balance until it is paid in full. The EDD shall then have the right to collect the Challenged Assessment Balance from Hansen using all means allowed by law. If Hansen makes a second default, the EDD agrees not to pursue any collection efforts against DiManno, Whitney or Serafin.

5

Settlement Agreement at 2-3.

An administrative law judge approved the Settlement Agreement on March 17, 2009. From April 2009 to September 2009, Hansen made six payments under the Settlement Agreement, totaling $1,000,513.46. Hansen did not, however, make the remaining payments.

In a November 6, 2009 letter to Hansen, the EDD notified Hansen that he had defaulted on the payment schedule and was in breach of the Settlement Agreement. The EDD further advised Hansen as follows:

> Pursuant to the Settlement Agreement, you have until November 16, 2009, to pay the balance due of $733,846.92. If you do not pay the balance due of $733,846.92, by November 16, 2009, the Employment Development Department will exercise its right to collect that sum by using means allowed by law.
>
> Furthermore, if you do not pay the balance due by January 16, 2010, you will owe the EDD the original amount of the assessment, less any settlement payments received. As of today, that amount is $3,819,990.61. In addition, interest and penalt[ies] will accrue until that amount is paid in full. The Employment Development Department will have the right to collect that amount using all means allowed by law.

Letter from EDD dated Nov. 6, 2009.

This letter notwithstanding, Hansen made no additional payments to the EDD.

### The Debtors' Bankruptcy and The Adversary Proceeding

Hansen and his wife, Amy Hansen (the "Debtors"), filed a chapter 7 bankruptcy petition on January 6, 2010. On March 30, 2010, the EDD commenced the adversary proceeding giving rise to this appeal. In its complaint (the "Complaint"), the EDD sought a determination that the $3,788,969 allegedly due and owing under the Settlement Agreement (the "UI Tax") was a "tax" of the kind

6

specified in § 507(a)(8)(C) and thus gave rise to a nondischargeable debt within the meaning of § 523(a)(1)(A). On April 29, 2010, the Debtors moved to dismiss the Complaint as to Amy Hansen.

After the Debtors moved to dismiss the Complaint but before the bankruptcy court denied the motion, the EDD filed a first amended complaint on May 24, 2010 (the "First Amended Complaint"). In the First Amended Complaint, the EDD sought the same determination of nondischargeability, but added the allegation that the debt resulting from the UI Tax was a community debt for which both Debtors were liable.

The Debtors answered the First Amended Complaint on June 13, 2010, admitting that the amount of the EDD's claim was $3,788,969, denying that the debt was a community debt for which both Debtors were liable, and asserting waiver and estoppel as affirmative defenses to the EDD's contention that the amount allegedly due and owing was a tax.

At trial, the EDD argued that Hansen's liability for the UI Tax was two-fold. First, it contended that Hansen was liable as a responsible person as defined by California Unemployment Insurance Code § 1735. Second, it contended that Hansen was contractually liable under the Settlement Agreement which he breached. The EDD also maintained that Amy Hansen was liable as Hansen's spouse. The Debtors, on the other hand, asserted that any liability Hansen faced under the Settlement Agreement was entirely contractual, and as such, did not give rise to a nondischargeable debt within the meaning of § 523(a)(1)(A).

After hearing the parties' opening arguments, the bankruptcy

7

court invited testimony on the issue of how the UI Tax was calculated. Brenda Farber, chief of the EDD's special procedures section, testified on that point. The bankruptcy court, however, found Farber's testimony incomplete, as she could not identify the interest rate used to generate the amounts at issue. To provide the EDD with the opportunity to supplement the evidence concerning the calculation of the UI Tax, the bankruptcy court continued the trial.[5]

Before adjourning, however, the bankruptcy court announced its preliminary rulings. First, the bankruptcy court determined that no judgment would be entered against Amy Hansen. The bankruptcy court concluded that she would be liable for the UI Tax only to the extent that the EDD could collect on its judgment from any of the Debtors' community property, and that the state court would have to resolve any issues as to what would constitute community property. Second, the bankruptcy court concluded that the UI Tax gave rise to a nondischargeable debt within the meaning § 523(a)(1)(A), as it was a "tax" of the kind specified in § 507(a)(8)(C).[6]

---

[5] The bankruptcy court cited an additional reason for the continuance: to allow both parties additional time to address whether any penalties included as part of the UI Tax would be dischargeable under § 507(a)(8)(G).

[6] At the time the bankruptcy court announced this preliminary ruling, the EDD had represented that a portion of the unemployment insurance premiums was deducted from employees' salaries while another portion was paid for by employers. However, at the beginning of the continued trial, the EDD conceded that the unemployment insurance tax is not withheld from employees. This is consistent with the EDD's explanation of

(continued...)

8

At the continued trial, the parties first addressed the issues relating to UI Tax calculation. The parties then offered their final arguments. The EDD argued that nothing in the plain language of § 507(a)(8)(C) imposed a requirement that the "tax required to be collected" be collected from a third-party. It maintained that the UI Tax at issue was a tax of the kind specified in § 507(a)(8)(C) because the EDD was required to collect it,[7] and as such, the UI Tax gave rise to a

[6](...continued) unemployment insurance taxes provided at oral argument.

[7] The EDD argued it was required to collect the UI Tax under California Unemployment Insurance Code § 301, which reads:

There is in the Labor and Workforce Development Agency the Employment Development Department, which is vested with the duties, purposes, responsibilities, and jurisdiction heretofore exercised by the State Department of Benefit Payments or the California Health and Human Services Agency with respect to job creation activities. The Employment Development Department shall be administered by an executive officer known as the Director of Employment Development who is vested with the duties, purposes, responsibilities, and jurisdiction heretofore exercised by the Director of Benefit Payments with respect to the following functions:

(a) Job creation activities.

(b) Making manual computations and making or denying recomputations of the amount and duration of benefits.

(c) Determination of contribution rates and the administration and collection of contributions, penalties and interest, including but not limited to filing and releasing liens.

(d) Establishment, administration, and transfer of reserve accounts.

(continued...)

9

nondischargeable debt under § 523(a)(1)(A).  The Debtors, however, argued that the UI Tax was not a "tax required to be collected" because it was an employer paid tax, not a tax collected from third parties.[8]  On that basis, the Debtors contended that the UI Tax did not give rise to a nondischargeable debt within the meaning of § 523(a)(1)(A).

At the conclusion of the continued trial, the bankruptcy court declined to adopt its prior preliminary rulings and stated the following findings of fact and conclusions of law:

> Well, [the Debtors] pointed out for the record what I had previously decided.  I've determined I was wrong on that score.  This is not a tax that is required to be collected in the light of a sales tax and it is not withheld.  The Board has conceded that, so it's not withheld.
> The question is whether it's collected. And I believe that "collected" means, as Collier defines it, tax is claimed, it's for a tax.  That's fine.  That meets the qualification. <u>The tax is owed by a party other than the debtor.</u>  That's true.  Here, it's owed by Onvoi.  <u>Tax must be collected or withheld from that party and transmitted to</u>

---

[7](...continued)
(e) Making assessments and the administration of credits and refunds.

(f) Approving elections for coverage or for financing unemployment and disability insurance coverage.

[8] In making their argument, the Debtors relied on California Unemployment Insurance Code § 976.  That section provides:

Employer contributions to the Unemployment Fund shall accrue and become payable by every employer, except an employer as defined by Section 676, for each calendar year with respect to wages paid for employment.  <u>The contributions are due and shall be paid to the department for the Unemployment Fund by each employer in accordance with this division and shall not be deducted in whole or in part from the wages of individuals in his employ.</u>

Cal. Unemp. Ins. Code § 976 (emphasis supplied).

10

the government. That's the part that daunts me, because it's not required to be withheld from employees' wages in any way. It's a tax upon the employer on the employer's payroll.

. . .

Even though the State says it's the liability of an officer of the employer, that's not what the Bankruptcy Code says. The Bankruptcy Code says that it has to be, in effect, a trust pass, sales tax, income taxes withheld from the employee, which really don't belong to the corporation, let's say, and for which the governmental units rely upon officers of the corporation to abide by the law to collect these taxes. They're supposed to hold them and transmit them to the taxing authority.

That isn't what we have here.

Hr'g Tr. (May 10, 2011) at 29:7-30:13 (emphasis supplied).

The bankruptcy court continued:

Consequently, I have to change my decision in respect to Mr. Hansen who I held liable in the previous hearing and state that he is not liable. The obligation is dischargeable in bankruptcy. And the fact that it's contractual doesn't change that. As a matter of fact, all contractual obligations . . . are discharged in bankruptcy.

So consequently, I must rule . . . that unemployment insurance tax that is assessed against an officer of a corporation under California law is a dischargeable obligation under bankruptcy law. . . . [W]e don't have to worry about the calculation of interest and penalties and all that, because the underlying obligation, tax obligation, is an obligation that is dischargeable in this bankruptcy proceeding . . . .

Hr'g Tr. (May 10, 2011) at 31:6-21.

On June 6, 2011, the bankruptcy court entered judgment for the Debtors. The EDD timely appealed.[9]

**DISCUSSION**

The sole issue on appeal is whether the UI Tax is a "tax required to be collected" within the meaning of § 507(a)(8)(C)

---

[9] The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

11

and thus gives rise to a nondischargeable debt pursuant to § 523(a)(1)(A). Under applicable law, we review such issues of statutory construction de novo. Friedman v. P+P, LLC (In re Friedman), __ B.R. __, __, 2012 WL 911545, at *5 (9th Cir. BAP Mar. 19, 2012) (citing AMB Prop., L.P. v. Official Creditors (In re AB Liquidating Corp.), 416 F.3d 961, 963 (9th Cir. 2005)). "De novo review means that the reviewing court 'do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.'" Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009) (modifications in original) (quoting United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988)).

Applying this standard, we hold that the UI Tax is not a tax contemplated by § 507(a)(8)(C), and that, consequently, it does not give rise to a nondischargeable debt within the meaning of § 523(a)(1)(A).

The EDD argues "plain meaning," and asserts that the bankruptcy court erred as a matter of law when it did not construe § 507(a)(8)(C) according to its understanding of plain meaning review.[10] Specifically, the EDD argues that the bankruptcy court "improperly imputed to the text of

---

[10] In its reply brief, the EDD also argues that the debt resulting from the UI Tax should be nondischargeable because a contrary determination would impair California's unemployment insurance trust fund. Aplt.'s Reply Br. at 4-5. However, the EDD did not raise this argument in its opening brief. For this reason, we consider the argument waived and need not entertain it here. See McKay v. Ingleson, 558 F.3d 888, 891 n.5 (9th Cir. 2009) (citing Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001)).

12

§ 507(a)(8)(C) two requirements not stated in the statute, i.e., that the 'tax required to be collected' had to be collected (1) by the <u>debtor</u> and (2) <u>from a third party</u>." Aplt.'s Opening Br. at 11 (emphasis in original). By so doing, the EDD contends, the bankruptcy court erroneously construed § 507(a)(8)(C) as applying exclusively to trust fund taxes. The supposed better view, to which the EDD contends we must subscribe, is that the UI Tax is a "tax required to be collected" because it is a tax the EDD must collect.

On the other hand, the Debtors argue that adopting the EDD's reading of the statute would "violate[] the rule of statutory construction requiring courts to apply meaning to every word, to avoid finding redundancies, [and] to avoid finding provisions of statutes meaningless." Aple.'s Responsive Br. at 6 (citations omitted). In particular, the Debtors maintain that "[i]f the tax specified in [§] 507(a)(8)(C) is 'tax collected by the government', then all of the other subsections of Section 507(a)(8) are rendered meaningless." <u>Id.</u> On these grounds, the Debtors contend that the EDD's reading of the statute is fatally flawed.

**A.  Principles of Statutory Construction**

Because the statutory text is "[t]he starting point in discerning congressional intent," any exercise in statutory construction begins there. <u>Lamie v. United States Tr.</u>, 540 U.S. 526, 534 (2003) (citation omitted). <u>See also</u> <u>Searcy v. Ada County Prosecuting Attorney's Office (In re Searcy)</u>, 463 B.R. 888, 892 (9th Cir. BAP 2012) (citations omitted). However, the inquiry also ends there "if the statutory language is unambiguous

13

. . . and the statutory scheme is coherent and consistent." _Schindler Elevator Corp. v. United States ex rel. Kirk_, __ U.S. __, __, 131 S. Ct. 1885, 1893 (2011) (internal quotation marks omitted) (quoting _Robinson v. Shell Oil Co._, 519 U.S. 337, 340 (1997) (in turn quoting _United States v. Ron Pair Enters., Inc._, 489 U.S. 235, 240 (1989)).

Accordingly, there is no reason to consult the legislative history unless the statutory text is ambiguous. _In re Searcy_, 463 B.R. at 892. "'[W]hether a statute is ambiguous is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole.'" _Id._ (modifications in original) (quoting _Hough v. Fry (In re Hough)_, 239 B.R. 412, 414 (9th Cir. BAP 1999) (quoting in turn _Robinson_, 519 U.S. at 341)).

### 1. The Statutory Text of § 507(a)(8)(C)[11]

We begin our exercise in statutory construction with the relevant statutory text. Section 507 provides:

> (a) The following expenses and claims have priority in the following order:
> . . .
> > (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for--
> > . . .
> > > (C) a tax required to be collected or withheld and for which the debtor is liable in whatever

---

[11] When the Code was originally enacted, the current § 507(a)(8) was designated as § 507(a)(6). With the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 350(2), 98 Stat. 333, 358, it was redesignated as 507(a)(7). The section was redesignated again, this time as 507(a)(8), under the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106. _See_ 4 COLLIER ON BANKRUPTCY ¶ 507.11[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

14

capacity . . . .

We focus our inquiry on the meaning of the phrase "tax required to be collected." Even though the EDD concedes that unemployment insurance tax is not withheld from employees, it nonetheless maintains that the UI Tax falls within the scope of § 507(a)(8)(C).

A good argument exists that the statutory text is ambiguous with respect to which taxes would fall under the category of a "tax required to be collected." See Shank v. State Dep't of Revenue (In re Shank), 792 F.2d 829, 830 (9th Cir. 1986) (consulting the legislative history to decide whether sales taxes collected from third parties were an excise tax under § 507(a)(6)(E) [now 507(a)(8)(E)] or a trust fund tax under § 507(a)(6)(C) [now 507(a)(8)(C)]); DeChiaro v. N.Y. State Tax Comm'n, 760 F.2d 432, 434 (2d Cir. 1985) (same). True, a statute's awkward and ungrammatical text is alone insufficient to render it ambiguous. See Lamie, 540 U.S. at 534. But here, as the language uses the passive voice, it is not clear whether the language anticipates that the collector of the tax must be the taxing agency (as the EDD contends) or the taxpayer (as argued by Hansen). Given that this critical distinction is not definitively answered by the statute's text, we turn to the legislative history to ascertain which of the two meanings urged upon us is most consistent with congressional intent.

**2.    The Legislative History**

Section 507 as it currently exists is a product of the Bankruptcy Reform Act of 1978, 95 Pub. L. No. 95-598, 92 Stat.

15

2549.[12]  Subparagraph (C) in particular is the result of a compromise which reconciled the differences between the House and Senate drafts of the provision.  See generally Kenneth N. Klee, Legislative History of the New Bankruptcy Law, 28 DEPAUL L. REV. 941, 953-57 (1979).  As set forth in the Joint Statement of Representative Edwards and Senator DeConcini,[13] which accompanied the negotiated provision, subparagraph (C) would establish priority for claims arising from:

> Taxes which the debtor was required by law to withhold or collect from others and for which he is liable in any capacity, regardless of the age of the tax claims.  This category covers the so-called "trust fund" taxes, that is, income taxes which an employer is required to withhold from the pay of his employees, and the employees' share of social security taxes.

124 Cong. Rec. 32,415 (1978) (emphasis supplied).

Based on the legislative history, we resolve § 507(a)(8)(C)'s ambiguity in favor of the Debtors.[14]  Doing

---

[12] The Bankruptcy Reform Act of 1978 provided the basis for the existing Code.  See 1 COLLIER, supra, ¶ 20.01.

[13] Given the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we treat their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent.  See Begier v. I.R.S., 496 U.S. 53, 64 (1990) (relying on floor statements of Representative Edwards and Senator DeConcini in determining whether post-petition payments of trust-fund taxes constituted voidable preference payments).

[14] Our view accords with the legislative history of § 17(a)(1)(e) of the former Bankruptcy Act, the predecessor to §§ 523(a) and 507(a)(8)(C).  Act of July 5, 1966, Pub. L. No. 89-496, 80 Stat. 270.  As amended in 1966, that provision excepted from discharge taxes the debtor "collected or withheld from others as required by the laws of the United States or any State or political subdivision thereof, but has not paid over . . . ."
The Ninth Circuit's decision in In re Shank, though specific to the appropriate categorization of sales taxes within the
(continued...)

16

otherwise would frustrate congressional intent. The legislative history shows that under § 507(a)(8)(C), a "tax required to be collected" must be collected from a third party. The UI Tax at issue here is not collected from a third party. Rather, as the EDD explained at oral argument, unemployment insurances taxes are payable directly by the employer; here, that was Onvoi. As such, it is not a "tax required to be collected" from anyone; Onvoi was responsible for its own debts. For this reason, we cannot conclude that the UI Tax is a tax of the kind specified in § 507(a)(8)(C). See 4 COLLIER, supra, ¶ 507.11[4] (identifying five elements that must be present for a claim to achieve priority under § 507(a)(8)(C) and emphasizing the requirement that "the tax at issue must be owed by a party other than the debtor and then collected or withheld by the debtor from the other party"). See also 3 NORTON BANKRUPTCY LAW & PRACTICE 3d § 49.52 (2012).

---

[14](...continued)
Code's priorities scheme, also lends support to our conclusion. There, the Ninth Circuit reasoned:

> § 17(a)(1)(e) excepted from discharge taxes the debtor "has collected or withheld from others." Although this language did not expressly refer to sales taxes, the legislative history strongly suggests that Congress did not intend to limit the § 17(a)(1)(e) exception to withholding taxes. . . . The indication, was, in fact, that the 17(a)(1)(e) exception was intended to extend to sale taxes a vendor has collected from its customers.

792 F.2d at 831 (citations omitted). See also DeChiaro, 760 F.2d at 434.

**B.     Debts Excepted from Discharge under § 523(a)(1)(A)**

Section 523(a)(1)(A) provides:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> (1) for a tax or a customs duty--
> (A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed . . . .

As a consequence, to be a nondischargeable tax under § 523(a)(1), the tax must also be a priority tax as contemplated by § 507(a)(3) or § 507(a)(8).  As we have determined that the UI Tax at issue here is not a tax of the kind specified in § 507(a)(8)(C) – the only provision as to which the EDD seeks to qualify the UI Tax as a tax within the meaning of § 523(a)(1)(A) – we must find that it does not give rise to a nondischargeable debt.  Cf. United States v. Sotelo, 436 U.S. 268, 279 (1978) (debtor's responsible person liability, imposed pursuant to Internal Revenue Code § 6672, for taxes debtor was required to collect but did not pay over, was nondischargeable under former Bankruptcy Act § 17(a)(1)(e)); In re Shank, 792 F.2d at 833 (excise taxes required to be collected from third parties fell within the scope of § 507(a)(6)(C) [now § 507(a)(8)(C)] and thus gave rise to a nondischargeable debt under § 523(a)(1)(A)); Vitaliano v. Cal. Franchise Tax Bd. (In re Vitaliano), 178 B.R. 205, 209 (9th Cir. BAP 1995) (tax claims were priority claims within the meaning of § 507(a)(7)(A) [now 507(a)(8)(A)] and therefore nondischargeable under § 523(a)(1)(A)); Raiman v. Cal. State Bd. Of Equalization (In re Raiman), 172 B.R. 933, 941 (9th Cir. BAP 1994) (California sales tax at issue was a tax within

18

the meaning of § 507(a)(7)(A) [now 507(a)(8)(A)] and therefore nondischargeable pursuant to § 523(a)(1)(A)); George v. Cal. State Bd. Of Equalization (In re George), 95 B.R. 718, 721 (9th Cir. BAP 1989), aff'd, 905 F.2d 1540 (9th Cir. 1990) (debtors' personal liability under California Revenue and Taxation Code § 6829 was an excise tax under § 507(a)(7)(E) [now § 507(a)(8)(E)] and thus nondischargeable under § 523(a)(1)(A)).

**CONCLUSION**[15]

For the reasons set forth above, we AFFIRM.

---

[15] Because we agree with the bankruptcy court's determination that the UI Tax is not of the kind specified under § 507(a)(8)(C) and therefore does not give rise to a dischargeable debt within the meaning of § 523(a)(1)(A), we decline to address any issues concerning any penalties or interest relating thereto.